UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HUGSON JEAN, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *  Civil Action No. 14-cv-11969-ADB |
| | * |
| MEGAN BRENNAN, | * |
| *Postmaster General, United States Postal Service*, | * |
| | * |
| | * |
| Defendant. | * |

**MEMORANDUM AND ORDER**

September 14, 2016

BURROUGHS, D.J.

    Plaintiff Hugson Jean ("Jean"), who is proceeding *pro se*, brings this action against Defendant Megan J. Brennan, Postmaster General of the United States Postal Service (the "Postal Service"), alleging racial discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). In the fall of 2009, Jean was terminated from his position as a transitional employee in the Hingham Post Office. Plaintiff alleges that he was terminated based on his race and color in violation of Title VII. Currently pending are cross-motions for summary judgment. For the reasons stated herein, both motions are DENIED.

## I. Factual and Procedural Background

    The following facts are undisputed, unless otherwise noted. Additional relevant facts will be discussed as needed in this Memorandum and Order.

    Jean is a Haitian black male. [ECF No. 115 ¶ 1]. From February 2009 until he was terminated in November 2009, Jean was employed by the Postal Service as a transitional employee ("TE") letter carrier in the Hingham Post Office. Id. ¶ 6. TE letter carriers and career

letter carriers have virtually the same responsibilities in that both are assigned to deliver mail. Id. ¶ 14. TEs and career carriers, however, have different wages, benefits, and privileges. Id. The TE position is a one-year position, which requires reappointment to be extended. Id. ¶ 7. In addition, according to the defendant, TEs are not subject to progressive discipline and can be removed for cause without warning, though Jean disputes this. Id. ¶ 15.

On November 6, 2009, Jean was subject to a pre-disciplinary interview ("PDI") to discuss certain issues with his performance. Id. ¶ 41. In addition to Jean, the PDI was attended by Jean's supervisor John Tuley, the then Postmaster General Patrick Donovan, and Michael Bertrand, who was then Shop Steward for the National Association of Letter Carriers ("NALC"). Id. At the end of the PDI, Donovan asked Jean for his ID badge, satchel, and uniform and escorted him out of the building. Id. ¶ 43. A week later, the Postal Service sent Jean a Notice of Removal formally terminating his employment with the Postal Service. [ECF No. 96 ("Driscoll Decl."), Ex. 20]. The letter stated that Jean was being removed because he had (1) failed to follow instructions; and (2) failed to discharge his assigned duties conscientiously and effectively. Id. The letter detailed two incidents that had purportedly led to Jean's removal: on November 3, 2009, he had failed to complete 89 assigned deliveries and missed several managed service point ("MSP") scans[1] and on November 4, 2009, he had lost a certified letter. Id. The Notice of Removal also stated that Jean had refused to follow instructions in connection with the MSP scans based on the fact that, contrary to Postal Service policy, Jean had insisted that the MSP scan locations be given to him, and that he not have to ask for them. Id.

---

[1] Along a delivery route, there are barcodes, known as MSPs, that the letter carriers must scan to track their progress.

Plaintiff alleges that the Postal Service's stated reasons for firing him were pretextual and that his termination was motivated by race discrimination. As the only black TE in the Hingham Post Office, Jean charges that he was treated differently than other similarly situated TEs who were not terminated for similar misconduct.

In addition, Jean alleges that his termination was linked to an incident, from a month earlier, in which he was accosted by a Postal Service customer. On October 9, 2009, after Jean delivered a certified letter to a postal customer, the customer approached his vehicle to tell him to take the letter back to the Post Office. [ECF No. 115 ¶¶ 22-23]. According to Jean, when he did not comply with the customer's request, "she got irate then she slapped me in the eyes and face with an opened hand." Id. ¶ 24. As described in the police report, she "lightly slapped" Jean in the face, knocking off his glasses. [ECF No. 96, Ex. 13]. She then went on a rant, calling Jean a racial slur. [ECF No. 115 ¶ 25].[2] After Jean reported the incident to his supervisor, two police officers were dispatched to the scene, and a few days later, the Hingham Police Department filed charges of "assault and battery – hate crime" against the postal customer. [ECF No. 96, Ex. 17]. Jean claims that following the incident, the defendant engaged in a series of deceptive tactics and misrepresentations that culminated in his termination. [ECF No. 61 ¶¶ 22-28].

In January 2010, Jean filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging that the Postal Service discriminated against him based on his race and color. [ECF No. 61-1, Ex. A]. On January 24, 2014, the EEOC's Office of Federal Operations issued its final decision finding no discrimination. [ECF No. 96, Ex. 28]. Jean initiated this action on April 30, 2014, naming Donovan, the Postmaster General at the time, as the defendant. [ECF No. 1]. Donovan was terminated as the defendant on March 9, 2015 and

---

[2] Mr. Jean filmed the encounter on his cell phone. Id.

3

replaced by Megan Brennan, the new Postmaster General of the United States Postal Service. [ECF No. 51]. Plaintiff filed a Third Amended Complaint, the now-operative complaint, on May 4, 2015. [ECF No. 61]. The Third Amended Complaint asserted four counts against the Postmaster: Count I for race/color discrimination in violation of Title VII, and Counts II, III, and IV for constructive fraud, extrinsic fraud, and intrinsic fraud, respectively. [ECF No. 61]. On August 11, 2015, the Court granted defendant's Motion to Dismiss Counts II, III, and IV, leaving only Count I for race/color discrimination. [ECF No. 78].

Defendant filed a motion for summary judgment on February 2, 2016 [ECF No. 98], and Plaintiff filed a cross-motion for summary judgment on March 28, 2016. [ECF No. 112]. Both parties have filed statements of undisputed facts [ECF Nos. 100, 114] and responses to the opposing party's statements of undisputed facts. [ECF Nos. 115, 124].

## II.    Legal Standard

Summary judgment is appropriate where the movant can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if its resolution might affect the outcome of the case under the controlling law." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003). "A genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way." Id.

"To succeed in showing that there is no genuine dispute of material fact," the moving party must point to "specific evidence in the record that would be admissible at trial." Ocasio-Hernandez v. Fortuño-Burset, 777 F.3d 1, 4 (1st Cir. 2015). "That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable

to carry its burden of persuasion at trial.'" Id. (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Once the movant takes the position that the record fails to make out any trialworthy question of material fact, "it is the burden of the nonmoving party to proffer facts sufficient to rebut the movant's assertions." Nansamba v. North Shore Med. Ctr., Inc., 727 F.3d 33, 40 (1st Cir. 2013).

In reviewing the record the court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Cochran, 328 F.3d at 6. The First Circuit has noted that this standard "is favorable to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011). "The factual conflicts upon which he relies must be both genuine and material," Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 396-97 (1st Cir. 2012), and the court may discount "conclusory allegations, improbable inferences, and unsupported speculation." Cochran, 328 F.3d at 6 (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Medina-Munoz, 896 F.2d at 8 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986)).

**III. Discussion**

A claim of employment discrimination alleging disparate treatment is evaluated under the three-step burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Step one requires that the plaintiff establish a *prima facie* case of discrimination. Id. at 802. This in itself has three elements, requiring a plaintiff to prove that: (1) he is a member of

a statutorily protected class; (2) he was qualified for the position held; (3) he was subject to an adverse employment action. Id. If the plaintiff is able to establish this *prima facie* case, an inference of discrimination arises and, at step two, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the termination and to produce credible evidence to show that the reason advanced was the actual reason. Id. To satisfy step two, the defendant must "clearly set forth, through the introduction of admissible evidence, the reasons for the [employee's termination]." Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 160 (1st Cir. 1998) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 (1981)) (alteration in original). "The explanation provided must be legally sufficient to justify a judgment for the [employer]." Id. If the defendant demonstrates a legitimate reason for its adverse action, "the presumption of discrimination drops from the case" and the burden shifts back to the plaintiff. Id. at 161. At step three, the burden is on the plaintiff to show that defendant's proffered nondiscriminatory reason was a pretext and that the real reason for the adverse action was discrimination. See Rodriguez-Cuervos v. Wal-Mart Stores, 181 F.3d 15, 19 (1st Cir. 1999). At step three, "[t]he plaintiff does not have to prove by a preponderance of the additional evidence that discrimination was in fact the motive for the action taken. All a plaintiff has to do is raise a genuine issue of fact as to whether discrimination motivated the adverse employment action." Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 433 (1st Cir. 2000) (quoting Olivera v. Nestle Puerto Rico, Inc., 922 F.2d 43, 50 (1st Cir. 1990)).

**1. Step 1: *Prima Facie* Case**

There is no dispute that Jean, a Haitian black male, is a member of a protected class, was qualified for his position as a TE, and was terminated. Jean's termination constitutes an adverse employment action.

Defendant nonetheless contends that it is entitled to summary judgment because the record lacks evidence regarding whether Jean was replaced and by whom. The defendant characterizes this as the fourth element of the *prima facie* case. For purposes of establishing his *prima facie* case, however, Jean does not need to demonstrate that a new employee was hired or a current employee was formally designated as a replacement, so long as there is evidence that defendant had a continuing need for the work that the employee was performing prior to the termination. Rodriguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d 52, 59 (1st Cir. 2005); see also Dunn v. Trustees of Boston Univ., 761 F.3d 63, 70 (1st Cir. 2014) ("[A]n employer's continuing need for the plaintiff's services can establish the fourth element of a prima facie case of discriminatory termination, *i.e.*, that he or she was replaced, even if the employer does not in fact hire a replacement."). Jean has satisfied this minimal fourth element. Regardless of whether a new employee formally replaced Jean, the Postal Service continued to service the routes Jean had covered, assigning other employees to deliver his routes.

"The burden for establishing a prima facie case is not onerous," Douglas v. J. Penney Co., 474 F.3d 10, 14 (1st Cir. 2007), and Jean has satisfied his burden. He has established that he is a member of a statutorily protected class, that he was qualified for the TE position, that he was terminated from his TE position, and that the Postal Service had a continuing need for the work that he had been performing.

**2. Step 2: Legitimate Nondiscriminatory Reason**

Next, because Jean has established a *prima facie* case of discrimination, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for terminating Jean. "This entails only a burden of production, not a burden of persuasion; the task of proving discrimination remains the claimant's at all times." Mesnick v. Gen. Elec. Co., 950 F.2d 816,

823 (1st Cir. 1991). Defendant alleges that the reason for Jean's termination was his poor performance. In its motion for summary judgment, the defendant lists numerous examples of Jean's poor performance, which include but are not limited to the incidents described in the November 13, 2009 Notice of Removal. [ECF No. 99 at 15-16]. Given that this step of the McDonnell Douglas framework only entails a burden of production, the defendant has easily satisfied step two and provided a legitimate, nondiscriminatory reason for terminating Jean.

### 3. Step 3: Pretext

Lastly, the burden shifts back to Jean to show that the employer's stated nondiscriminatory reason was pretextual. "'To defeat a motion for summary judgment,' Plaintiff need only show that her ability to meet her burden of proving pretext 'turns on a genuine issue of material fact.'" Weeks v. Lower Pioneer Valley Educ. Collaborative, No. 14-30097-MGM, 2016 WL 696096, at *9 (D. Mass. Feb. 19, 2016) (quoting Soto-Feliciano v. Villa Cofresí Hotels, Inc., 779 F.3d 19, 23 (1st Cir. 2015)).

"One method [to show that the employer's stated reasons are pretextual] is to produce evidence that the plaintiff was treated differently than other similarly situated employees." Kosereis v. Rhode Island, 331 F.3d 207, 213-14 (1st Cir. 2003). "Evidence that an employer administered disparate treatment to similarly situated employees *may* be competent proof that the explanation given for the challenged employment action was pretextual, *provided* the plaintiff-employee can make a preliminary showing that others *similarly situated . . . in all relevant respects* were treated [more advantageously] by the employer." Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 43-44 (1st Cir. 2001) (emphasis in original) (internal citations omitted); see also Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st Cir. 1999) ("Reasonableness is the touchstone: while the plaintiff's case and the comparison cases that he advances need not be

perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances.").

Jean attempts to establish pretext by showing that other similarly situated TEs in the Hingham Post Office were treated differently than him. He alleges that around the time he was terminated, other white TEs engaged in the same alleged misconduct described in his Notice of Removal, but were not terminated.

Kristin Curran, for example, a white TE in the Hingham Post Office, had a PDI, but was not terminated, after she missed a "relay box" while delivering mail by hand in December 2009.[3] [ECF No. 124 ¶ 47]. Ms. Curran also missed all of her MSP scans on November 3 and November 4, but was not disciplined. Id. ¶ 58. Victor Shannon, another white TE, was originally suspended, but then had his suspension expunged, for "depositing residential and business mail collected along your assignment when returning from the street operation." Id. ¶ 42; [ECF No. 100 ¶ 75]. In addition, on both November 3 and November 4 Shannon missed two MSP scans on his delivery route, but was not disciplined. [ECF No. 124 ¶ 57]. Other TEs also missed all or some of their MSP scans on November 3 and November 4, and were not disciplined. Id. ¶¶ 59-60.

The defendant responds that none of these employers were "similarly situated 'in all relevant respects' such that Plaintiff could establish disparate treatment." [ECF No. 123 at 8]. First, with respect to Curran, the defendant claims that, "there is no evidence that Ms. Curran failed to deliver mail, whether certified or otherwise," and that "the fact that she missed all delivery scans indicates that there may have been a problem with her scanner." Id. at 9. Further,

---

[3] In a truck route, the carrier brings all the mail with him in the truck for delivery. On a walking route, the mail is stored in "relay boxes" along the route, and the carrier must stop and pick up the mail from each relay box.

the defendant states that "there is no evidence that Ms. Curran habitually missed MSP scans, refused to follow the MSP scan protocol, or missed any deliveries as a result of missing MSP scans . . . [or that] Ms. Curran regularly failed to follow his supervisor's instructions. . . ." Id. Likewise, with respect to Shannon, the defendant responds that, "Shannon did not lose *certified* mail, which is different than regular outgoing mail," that "because he missed the same scans each day, it was possibly the fault of MSP scan tags on the route," and that "there is no evidence that Mr. Shannon habitually missed MSP scans, or missed any deliveries as a result of missing MSP scans." Id. As for the remaining TEs that missed some or all MSP scans, the defendant claims that the fact that the same address was missed two days in a row suggests that there may have been a technical issue with the scanning, and that it was not their fault. Id. at 10.

While there are certainly some differences between these employees and Jean, their disparate treatment raises genuine questions about the circumstances surrounding Jean's termination. For instance, the evidence reveals that missed MSP scans were a pervasive problem among TEs, yet during the relevant time period, no one was disciplined for it besides Jean. According to the defendant, when other employees missed MSP scans, it was the technology's fault, but when Jean missed MSP scans, he was to blame. Further, both Jean and Curran missed a relay box on Route 11 in late 2009. The defendant claims that there is "no evidence that Ms. Curran failed to deliver mail." [ECF No. 123 at 9]. When Jean missed a relay box on the same route, however, he was accused of failing to deliver mail to 89 households and promptly terminated. In addition, while the defendant asserts that none of the other TEs lost certified mail or failed to follow instructions, there is a genuine dispute as to whether Jean actually lost a certified letter, given evidence that the letter at issue was delivered shortly thereafter, [ECF No.

124 ¶ 46], as well as some confusion over what instructions Jean failed to follow and how that factored into his termination. [ECF No. 115 ¶ 47].

To further distinguish the other employees, the defendant points to numerous other alleged reasons why Jean was terminated, which were not included in the Notice of Removal, but were nonetheless indicative of his poor performance. These include that the following:

- Acting supervisor Janet Healy had to remind Plaintiff on several occasions that he was supposed to call the office when he was going to be late; despite being told to call many times, Plaintiff refused to follow instructions and never called.

- Acting closing supervisor Chinsoo Chung found outgoing mail on the dashboard of the Postal vehicle Plaintiff had used that day. Despite being told not to leave outgoing mail in the vehicle, Plaintiff did it again a few days later. Plaintiff also left his truck unlocked.

- On several occasions during Plaintiff's employment, Postmaster Donovan spoke with Plaintiff about issues regarding his work performance, including problems completing his MSP scans and an incident in which Plaintiff drove over a customer's lawn during the delivery of an express piece of mail.

[ECF No. 99 at 15-16]. These performance issues, however, were not listed in the Notice of Removal and were not discussed at the PDI. "[W]hen a company, at different times, gives different and arguably inconsistent explanations, a jury may infer that the articulated reasons are pretextual." Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir. 2000); see also Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 142 (1st Cir. 2012) ("The employer's contemporaneous beliefs are a vital consideration because '[i]n assessing pretext, a court's focus must be on the perception of the decisionmaker.'") (quoting Mesnick, 950 F.2d at 824); Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir.2000) ("Another method of establishing pretext is to show that [the employer]'s nondiscriminatory reasons were after-the-fact justifications provided subsequent to the beginning of legal action."). While these newly proffered reasons do not establish pretext, they do raise a genuine dispute as to what motivated the Postal Service's decision to terminate Jean's employment.

11

Ultimately, because it is difficult for an employee to determine the legitimacy of its employer's motive, "where a plaintiff in a discrimination case makes out a prima facie case and the issue becomes whether the employer's stated nondiscriminatory reason is a pretext for discrimination, courts must be particularly cautious about granting the employer's motion for summary judgment." Hodgens, 144 F.3d at 167 (quotation marks omitted). The First Circuit has instructed courts to "use restraint in granting summary judgment where discriminatory animus is in issue." Id. Restraint is particularly appropriate here, where plaintiff has proceeded *pro se*. Though the evidence of pretext is not overwhelming, and does not entitle Jean to summary judgment, there is a triable jury question as to what motivated the defendant's decision to terminate Jean. Jean, the only black TE in the Hingham Post Office, was terminated for the same sorts of misconduct that were seemingly overlooked when committed by white TEs. While there are certain differences between these white TEs and Jean that may explain the disparate treatment, Jean has made out a claim of disparate treatment sufficient to survive summary judgment and advance to trial.

## IV.   Conclusion

For the reasons stated herein, the cross-motions for summary judgment [ECF Nos. 98, 112] are DENIED. A status conference has been scheduled for Tuesday September 20, 2016 at 10:30 AM in Courtroom 17.

**So Ordered.**

Dated: September 14, 2016

/s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT COURT JUDGE